

**FILED & ENTERED**

**JAN 15 2021**

**CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Kevin Garnier, Debtor. | Case No.:   2:19-bk-14464-ER<br>Adv. No.:   2:19-ap-01233-ER |
| Rolando Blue,<br><br>                                          Plaintiff,<br>v.<br>Kevin Garnier,<br><br>                                          Defendant. | **MEMORANDUM OF DECISION FINDING THAT PLAINTIFF ROLANDO BLUE IS NOT ENTITLED TO A JUDGMENT OF NON-DISCHARGEABILITY AGAINST DEFENDANT KEVIN GARNIER**<br><br>**TRIAL:**<br><br>Date:       September 29, 2020<br>Time:      9:00 a.m.<br>Location: Ctrm. 1568<br>               Roybal Federal Building<br>               255 East Temple Street<br>               Los Angeles, CA 90012 |

## I. Introduction[1]

On November 2, 2018, Plaintiff Rolando Blue ("Blue") obtained a small claims judgment against Defendant Kevin Garnier ("Garnier") in the amount of $10,155.00 (the "Judgment"). The Judgment arose from Blue's allegations that Garnier "did not complete construction job at my

---

[1] This disposition is not appropriate for publication.

residence that they were contracted to do" and that Garnier "abandoned assignment."[2] Blue alleges that the Judgment is non-dischargeable pursuant to § 523(a)(2)(A) and (a)(6).[3]

As a result of the COVID-19 pandemic, trial was conducted by videoconference on September 29, 2020.[4] Blue filed a closing brief on November 13, 2020,[5] and Garnier filed a closing brief on November 16, 2020.[6] This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Civil Rule 52, made applicable to these proceedings by Bankruptcy Rule 7052.[7]

For the reasons set forth below, the Court finds that Blue is not entitled to a judgment of non-dischargeability against Garnier under § 523(a)(2)(A) or (a)(6). The Court will enter judgment in favor of Garnier.

## II. Findings of Fact
### A. The Contract to Renovate the Property

In March 2018, Blue hired Garnier to renovate the residential property (the "Property") in which Blue and his brother, a disabled veteran, reside.[8] Blue wanted to use the Property to operate a facility to provide long-term care for disabled veterans.[9] To accomplish this objective, it was necessary for the Property to be brought into compliance with the Americans with Disabilities Act (the "ADA").[10]

Garnier learned about the job through an ad that Blue had posted on Craigslist.[11] Blue's Craigslist ad sought day laborers to complete the work.[12] Garnier contacted Blue and convinced him that a team supervised by a professional contractor would be necessary to achieve Blue's remodeling objectives.[13] Garnier met with Blue at the Property three to five times before the parties reached an agreement for Garnier to remodel the Property.[14]

---

[2] Blue's Ex. 1 (Small Claims Complaint).
[3] On May 13, 2020, the Court dismissed Blue's § 523(a)(4) cause of action for larceny for failure to state a claim upon which relief can be granted. *See* Doc. No. 22 (order dismissing § 523(a)(4) claim) and Doc. No. 20 (ruling setting forth reasons for dismissal of the claim).
[4] A transcript of the trial proceedings is available as docket entry 46 and is cited as "Tr."
[5] Doc. No. 47.
[6] Doc. No. 48.
[7] Unless otherwise indicated, all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1–86; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037; all "Evidence Rule" references are to the Federal Rules of Evidence, Rules 101–1103; all "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1–9075-1; and all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.
[8] Tr. at 10:19–11:6 (testimony of Blue).
[9] *Id.* at 11:7–8 (testimony of Blue).
[10] *Id.* at 11:9–11 (testimony of Blue).
[11] *Id.* at 57:17 (testimony of Garnier).
[12] *Id.* at 57:16–58:3 (testimony of Garnier).
[13] *Id.* at 58:4–8 (testimony of Garnier).
[14] *Id.* at 57:3–6 (testimony of Garnier).

The agreement was memorialized in a contract prepared either by Garnier or at his direction[15] (the "Contract")[16] (attached hereto as Exhibit 1 and incorporated herein by reference). The Contract contains the heading "Du All Home Service." Garnier's contractor's license number "B342480" appears underneath the "Du All Home Service" heading. The Contract states that it is "a contract for work to be done at address listed above according to instructions by property owner." The Contract includes a list of work to be performed, including, *inter alia*, (1) the demolition of various parts of the Property; (2) the installation of new interior doors; (3) the installation of recessed lighting; and (4) the remodeling of the kitchen and bathrooms. The Contract lists the cost of "labor and materials" at $32,550.00, and contains the following "payment schedule":

1) $8,137.00[.] [I]nitial payment.
2) $8,137.00[.] After demo [demolition], recessed lights, doorway widened, walls and ceiling patched, primed and painted[.]
3) $8,137.00[.] After all flooring installed, new doors installed, bathroom shower complete.
4) $8,139.00[.] After everything is finished and meets approval of owners.

The Contract that was introduced into evidence does not contain the signatures of either Blue or Garnier. Notwithstanding the absence of a signature page, the Court finds the document to be a contract that bound the parties. First, Blue testified that Garnier had signed a document containing the same terms as the Contract.[17] Second, the Judgment entered by the Small Claims Court is predicated upon the existence of a binding contract. The *Rooker-Feldman* doctrine precludes the parties from attacking the existence and validity of the contract before the Bankruptcy Court.

Blue testified that to induce him to enter into the Contract, Garnier falsely represented that he had been a licensed contractor for thirty years.[18] The Court finds that Garnier did not tell Blue that he had been a licensed contractor for thirty years, and that Blue entered into the Contract based on Garnier's truthful statements that he had substantial experience in the construction industry, including experience with ADA-compliant remodeling.

An explanation of the history of Garnier's contractor's license provides context for the Court's findings. Garnier's father was a licensed contractor who started a construction business in 1977.[19] Garnier worked for his father in the construction industry for at least twenty years.[20] When Garnier's father died in 2008, Garnier made use of a provision allowing him to assume his father's contractor's license.[21] Therefore, although Garnier has approximately thirty years' experience in the construction industry, he has only been a licensed contractor since 2008 when he assumed his father's contractor's license.

---

[15] *Id*. at 69:21–70:7 (Garnier's testimony that although he could not remember who drafted the Contract, it was drafted either by him or his staff).
[16] Blue's Ex. 3.
[17] Tr. at 27:7–13.
[18] *Id*. at 12:23–13:6.
[19] *Id.* at 50:12–13 (testimony of Garnier).
[20] *Id.* at 50:16 (testimony of Garnier).
[21] *Id.* at 50:17–21 (testimony of Garnier).

Garnier credibly testified that he did not tell Blue that he had been licensed for thirty years, but instead told Blue that he had substantial construction experience:

> **Question (by Garnier's counsel):** And you told me that you told Mr. Blue that you were licensed, bonded, and insured, and that you had approximately thirty years of experience in the construction business?
> **Answer (by Garnier):** Well, I don't think I put an exact number on it. I—I tell everybody the same story. I grew up in this business. That's—that's the way my father ran it. If you didn't learn what he did, you probably were left short on something that you really wanted as a kid. So I grew up in this business. So if you want to put numbers on it, but I—I never put an exact number on it, no….
> **Question (by Blue's counsel):** You were a licensed, board-certified contractor, right?
> **Answer (by Garnier):** Well, they don't call it board-certified, but I was a licensed, bonded, and insured contractor.
> **Question (by Blue's counsel):** Okay. And you had been doing this for thirty years, you said?
> **Answer (by Garnier):** No, I did not really say that, sir. I said I had grown up in this business. I took over the license in 2008 ….

Tr. at 54:5–15 and 71:10–16.

Blue's testimony regarding his initial meeting with Garnier corroborated the fact that Garnier emphasized his substantial construction experience rather than the number of years he had been licensed. Blue testified:

> And I—when I got into the contract with Mr. Garnier, I told him that I was trying to do like a facility, and he said he had experience, he'd done many ADA facilities. I believe he told me his dad was a veteran. But he said he had a lot of experience and he could get the job done.

Tr. at 11:13–18.[22]

As the testimony excerpted above illustrates, the key determinants in Blue's decision to award Garnier the contracting job were Garnier's substantial construction experience and Garnier's experience performing ADA-compliant remodels. The Court finds that Blue's decision was not meaningfully affected by the specific number of years that Garnier had been licensed. In making this finding, the Court notes that Garnier gave Blue the name of Monica Denton as a reference to vouch for Garnier's work performing ADA-compliant remodels for disabled

---

[22] After further questioning by his counsel, Blue also testified that Garnier had told him he had been a licensed contractor for over thirty years. Tr. at 12:23–13:2. The Court finds that the testimony excerpted above provides the most accurate summation of Blue's reasons for selecting Garnier. Unlike Blue's later testimony, the testimony excerpted above was part of Blue's lengthy narration of his first encounter with Garnier. The contents of that narration were not influenced by the questions of Blue's counsel.

veterans.[23] Denton was in charge of awarding grants to veterans to bring their homes into compliance with the ADA.[24]

Blue argues that the Contract was misleading because at the time it was executed, the business name associated with Garnier's contractor's license number was no longer "Du All Home Service." There is no dispute that at the time the Contract was executed, the business name associated with Garnier's contractor's license number was "HQ Construction Company," not "Du All Home Service." (Where, as here, a contract for construction services mis-states the business name associated with the contractor's license number, the contract is said to be "out of namestyle.")

The testimony adduced at trial does not support Blue's contention that the namestyle of the Contract was material to Blue's decision to award Garnier the construction job. As discussed above, the testimony showed that Blue hired Garnier because he had substantial experience in the construction industry, including experience performing ADA-compliant remodeling. The testimony did not establish that Blue chose Garnier because the Contract indicated that Garnier was doing business under the name "Du All Home Service." For example, Blue did *not* testify that he entered into the Contract because he had conducted research on Du All Home Service or had read positive reviews about the work that Du All Home Service had performed. Everything about Blue's testimony indicated that he executed the Contract based on his discussions with Garnier, and that it would have made no difference to Blue if the Contract had been under the name "HQ Construction Company" rather than "Du All Home Service."

Blue also attempted to introduce testimony that Garnier made misrepresentations regarding the availability of appliances and materials, the extent to which Garnier would be present at the job site during the remodeling, and the extent to which past clients had found Garnier's work to be satisfactory.[25] The Court excluded Blue's testimony as beyond the scope of the Complaint and the Pretrial Order.[26]

In sum, the admissible evidence presented at trial did not establish that Blue entered into the Contract as a result of misrepresentations made by Garnier.

**B. Events Subsequent to Execution of the Contract**

Before work commenced, Blue made the first payment called for under the Contract, in the amount of $8,137.00, by way of a check dated March 13, 2018 that was payable to "Du All Homeservices."[27] On March 23, 2018, Blue made a second payment of $8,137.00, by way of a check payable to "Du All Homeservice."[28] Blue did not make the third and fourth payments required by the Contract.

As a result of various disagreements and misunderstandings that arose between Garnier and Blue, Garnier did not complete the work required under the Contract. For example, a dispute arose concerning a wall between the kitchen and main room that Blue wanted removed. Garnier refused to remove the wall because he believed the wall was load-bearing and could not be safely

---

[23] *Id.* at 52:17–53:4 (testimony of Garnier).
[24] *Id.* (testimony of Garnier).
[25] *Id.* at 14:23–17:4 (testimony of Blue).
[26] *Id.* at 17:5–20:13 (Court's ruling regarding the admissibility of Blue's testimony).
[27] Blue's Ex. 4; Tr. at 20:18–21:8 (testimony of Blue).
[28] Blue's Ex. 5; Tr. at 21:9–14 (testimony of Blue).

removed.[29] Blue disputed Garnier's conclusion that the wall was load-bearing and was upset that Garnier refused to remove it.[30]

A misunderstanding concerning the appliances to be installed also caused problems. Garnier had the ability to obtain a sizeable discount on appliances, but only if the appliances were mid-range.[31] The discount that Garnier could obtain on the more expensive appliances that Blue wanted was much less than Blue was expecting.[32] When Blue found out about the lower discount, he asked Garnier to call off the appliance order.[33] The resulting delay in obtaining the appliances made it impossible for Garnier to complete the project by the April 1 date set forth in the Contract.[34] Blue was not pleased about the delay.[35]

Tensions between Blue and Garnier led to Garnier ceasing work on the project on approximately April 15, 2018.[36] On June 8, 2018—after Blue had filed the Small Claims Complaint against Garnier—Garnier sent Blue an e-mail offering to complete the work in exchange for the remaining payments of approximately $16,000 due under the Contract.[37] Blue declined the offer because he had lost confidence in Garnier's ability to adequately complete the work.[38]

It is not necessary for the Court to assign responsibility for the disagreements and misunderstandings that prevented the remodeling project from proceeding smoothly. The Court finds only that these disagreements and misunderstandings created a fundamental rift in the parties' working relationship, such that Blue lost confidence in Garnier and did not want him to continue to perform under the Contract.

On May 30, 2019, the California Contractor's State License Board (the "CSLB") filed an Accusation against Garnier seeking revocation of his contractor's license (the "Accusation").[39] On December 16, 2019, Garnier and the CSLB executed a *Stipulated Revocation of License and Disciplinary Order* (the "Stipulated Revocation")[40] providing for the revocation of Garnier's contractor's license. Because the charges set forth in the Accusation were never proven at a hearing, the Court admitted the Accusation and the Stipulated Revocation only for the purpose of showing that the Accusation had been filed and that Garnier's license had been revoked, not for the purpose of establishing the truthfulness of any of the charges contained in the Accusation.[41]

//
//

---

[29] Tr. at 58:16–59:1 (testimony of Garnier).
[30] *Id*. at 40:19–41:2, 43:14–44:9, and 46:20–47:16 (testimony of Blue).
[31] *Id.* at 59:2–17 (testimony of Garnier).
[32] *Id.* (testimony of Garnier).
[33] *Id.* (testimony of Garnier).
[34] *Id.* at 79:5–23 (testimony of Garnier).
[35] Garnier's Ex. D (text message from Blue to Garnier expressing frustration about the delay in the arrival of the appliances).
[36] Tr. at 78:23–79:4 (testimony of Garnier).
[37] Garnier's Ex. E.
[38] Tr. at 28:4–8 (testimony of Blue).
[39] Blue's Ex. 6.
[40] Blue's Ex. 6A.
[41] Tr. at 90:23–91:8 (Court's ruling regarding the admissibility of the Accusation and Stipulated Revocation).

## III. Conclusions of Law
### A. Blue is Not Entitled to a Judgment of Non-Dischargeability Pursuant to § 523(a)(2)(A)

Section 523(a)(2)(A) provides: "A discharge under section 727 … of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To except debts from discharge, a creditor has the burden of proof under the preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654 (1991).

To prevail on a § 523(a)(2)(A) claim on the grounds of false pretenses or false representation, a creditor must prove that:

1) the debtor made the representations;
2) that at the time he knew they were false;
3) that he made them with the intention and purpose of deceiving the creditor;
4) that the creditor relied on such representations; and
5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

*Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).

As set forth in Section II.A., above, the evidence presented at trial did not establish that Blue entered into the Contract as a result of misrepresentations made by Garnier. Instead, the testimony showed that Blue hired Garnier based upon Garnier's truthful statements that he had substantial construction experience, including experience performing ADA-compliant remodels. The only inaccurate statement made by Garnier pertained to the namestyle of the Contract—at the time the Contract was executed, the business associated with Garnier's contractor's license was "HQ Construction Company," not "Du All Home Service" as stated on the Contract. However, the namestyle of the Contract was not material to Blue's decision to hire Garnier. Blue hired Garnier based on his construction experience, not based on the identity of the company under which Garnier was doing business.

Blue argues that Garnier is liable under § 523(a)(2)(A) because at the time the parties executed the Contract, Garnier did not intend to complete the remodel. Blue's argument is without merit. As explained in Section II.B., Garnier did not complete the work called for under the Contract because Blue lost confidence in Garnier after a series of disagreements and misunderstandings. Had Garnier intended from the outset to abandon the job as Blue alleges, Garnier would not have offered to return and complete the job on June 8, 2018.

Blue has failed to prove that he is entitled to judgment of nondischargeability under § 523(a)(2)(A).

### B. Blue is Not Entitled to a Judgment of Non-Dischargeability Pursuant to § 523(a)(6)

"Section 523(a)(6) excepts from discharge debts arising from a debtor's 'willful and malicious' injury to another person or to the property of another. The 'willful' and "malicious" requirements are conjunctive and subject to separate analysis." *Plyam v. Precision Development, LLC (In re Plyam)*, 530 B.R. 456, 463 (9th Cir. B.A.P. 2015) (internal citations omitted).

An injury is "willful" when "a debtor harbors 'either subjective intent to harm, or a subjective belief that harm is substantially certain.' The injury must be deliberate or intentional,

'not merely a deliberate or intentional act that leads to injury.'" *Id.* at 463 (internal citations omitted). An injury is "malicious" if it "involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146–47 (9th Cir. 2002) (internal citations omitted).

In addition, the injury-producing conduct must be tortious in order to be excepted from discharge under §523(a)(6). *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008). "[C]onduct is not tortious under § 523(a)(6) simply because injury is intended or 'substantially likely to occur,' but rather is only tortious if it constitutes a tort under state law." *Id.* at 1041.

Garnier's failure to complete the work required under the Contract was not "willful" for purposes of § 523(a)(6). As discussed in Section II.B., Garnier's non-completion of the Contract resulted from a series of disagreements and misunderstandings between Garnier and Blue. Garnier had no subjective intent to harm Blue and had no belief that harm was substantially certain. The breakdown in the parties' working relationship was the result of poor communication, not "willfulness" on the part of Garnier.

For the same reasons, Garnier's conduct was not "malicious." It was not Garnier's intent that the job remain uncompleted. Garnier offered to finish the work even after Blue had filed the Small Claims Complaint against him. Garnier did not complete the Contract because Blue had lost faith in him, not because he intended to default on his obligations.

This case involves a garden variety breach-of-contract dispute. Nothing that Garnier did or did not do comes even close to meeting the exacting standard necessary to establish liability under § 523(a)(6).

## IV. Conclusion

Based upon the foregoing, the Court finds that Blue is not entitled to a judgment of non-dischargeability under either § 523(a)(2)(A) or (a)(6). The Court will enter judgment in Garnier's favor.

###

Date: January 15, 2021

Ernest M. Robles
United States Bankruptcy Judge

# Exhibit 1—Contract

## Du All Home Service
B342480

8748 S. LaSalle Avenue
Los Angeles, CA 90047
310-722-5612

Ron Blue
1242 S. Hi Point
Los Angeles, CA 90402

**Labor and materials**
**$32550.00**

The following is a contract for work to be done at address listed above according to instructions by property owner.

| Item Description | | |
|---|---|---|
| Demolition: To include but not limited to: removal of all base molding, window trim, door trim, cove molding, kitchen(everything), large bathroom(everything), small bathroom(everything) Remove all debris. | | |
| Patch, prime and paint all walls and ceilings. Color choice by owner. | | |
| Bring all electrical and plumbing up to code. | | |
| Install recessed lights in all rooms and hallways. Style of lights and quantity chosen by owner. | | |
| Widen doorway from dining room to kitchen. Currently 32". Widen to 72". | | |
| Install new interior doors and hardware. Style of doors chosen by owner. | | |
| *Remodel kitchen according to owners instructions. To include but not limited to cabinets, countertop, sink, appliances, faucet, etc. | | |
| *Remodel bathrooms according to owners instructions. To include but not limited to large walk-in shower, toilet, vanity medicine cabinet and mirror. | | |
| Install new ADA compliant flooring throughout the house. Please note that existing floor is currently not level in several areas. This will addressed and corrected. | | |
| Build cabinet or enclosure to hide ac ducting in laundry room. | | |
| Remove closets in designated areas to enlarge existing rooms. | | |

| | | |
|---|---|---|
| Install new molding(base, door, window, etc..) where requested.<br><br>Purchase and install new appliances as requested.<br><br>Install ADA approved ramps at front and rear entrance.<br>Install wrought iron fence around hot tub with locking gate.<br><br>Remove all debris.<br><br>All work must begin asap and conclude by April 1, 2018 or contractor agrees to a $250 per day penalty.(Owner choices of appliances, cabinet styles, etc. must be given in a timely manner for this to apply.)<br><br>*All remodeling materials used are mid-range. Anything custom will be extra. | | |
| Labor and materials:<br><br>Payment schedule:<br>1. $8137.00<br>   initial payment.<br><br>2. $8137.00<br>   After demo, recessed lights, doorway widened, walls and ceiling patched, primed and painted<br><br>3. $8137.00 After all flooring installed, new doors installed, bathroom shower complete.<br><br>4. $8139.00 After everything is finished and meets approval of owners. | | $32,550.00 |

Terms & Conditions

_____